UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DANA SNEADE, SHARDE RUSSELL, ELIJAH WILLIAMSON, <br> Plaintiff, <br><br> v. <br><br><br> MARK ROJAS, <br> GARY J. GEMME, Chief of Police, <br> MICHAEL O'BRIEN, City Manager, <br> THE CITY OF WORCESTER, <br> and Does 1-5, <br> Defendants. | CIVIL ACTION <br> NO. 11-40061-TSH |

ORDER AND MEMORANDUM OF DECISION
March 10, 2014

**HILLMAN, D.J.**

**Background**

Dana Sneade ("Sneade"), Sharde Russell ("Russell"), and Elijah Williamson ("Williamson") have filed a federal civil rights claim against Worcester Policer Officer Mark Rojas ("Officer Rojas"), Gary J. Gemme, Chief of Police ("Chief Gemme"), Michael O'Brien, City Manager ("City Manager O'Brien"), and Does 1-5 under 42 U.S.C. §1983 for violation of their constitutional rights. Plaintiffs have also filed Massachusetts state law claims against Defemdamts for violation of the Massachusetts Civil Rights Act ("MCRA"), Mass.Gen.L. ch.

12, §§11-H-I and tort law claims for assault and intential infliction of emotional distress. Specifically, Plaintiffs allege that Officer Rojas needlessly and recklessly shot and killed their pet dog while answering a dometic dispute call at Sneade's residence.  Plaintiffs further allege that thereafter, Officer Rojas also unlawfully filed a false report with the Department of Social Services ("DSS") about Sneade and unlawfully accessed Sneade's CORI record and impermissibly provided information about her criminal record to her employer, Fallon Clinic, which resulted in her being fired.[1]  Defendants have moved for summary judgment (Docket No. 52) and to strike Plaintiffs' statement of additional facts and exhibits (Docket No. 68).   For the reasons set forth below, those motions are granted, in part, and denied, in part.   The Plaintiffs have filed a motion to strike the testimony of Defendants' experts (Docket No. 70), which is denied.

## Standard of Review

Summary Judgment is appropriate where, "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Carroll v. Xerox Corp.*, 294 F.3d 231, 236 (1st Cir. 2002) (citing Fed. R. Civ. P. 56(c)).   "'A "genuine" issue is one that could be resolved in favor of either party, and a "material fact" is one that has the potential of affecting the outcome of the case."   *Sensing v. Outback Steakhouse of Florida, LLC*, 575 F.3d 145, 152 (1st Cir. 2009) (quoting *Calero-Cerezo v. U.S. Dep't. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004)).

---

[1] At the hearing on Defendants' motion for summary judgment, Plaintiffs conceded that the Doe Defendants should be dismissed and that summary judgment should enter against them with respect to the claims that Officer Rojas made a false report to the Department of Social Services and unlawfully accessed Cori information concerning Sneade.

When considering a motion for summary judgment, the Court construes the record in the light most favorable to the nonmoving party and makes all reasonable inferences in favor thereof. *Sensing,* 575 F.3d at 153. The moving party bears the burden to demonstrate the absence of a genuine issue of material fact within the record. *Id.,* at 152. "'Once the moving party has pointed to the absence of adequate evidence supporting the nonmoving party's case, the nonmoving party must come forward with facts that show a genuine issue for trial.'" *Id.* (citation to quoted case omitted). "'[T]he nonmoving party "may not rest upon mere allegations or denials of the [movant's] pleading, but must set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which [s/he] would bear the ultimate burden of proof at trial." *Id.* (citation to quoted case omitted). The nonmoving party cannot rely on "conclusory allegations" or " improbable inferences". *Id.* (citation to quoted case omitted). " ' The test is whether, as to each essential element, there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." ' " *Id.* (citation to quoted case omitted).

**The Parties' Motions To Strike**

*Defendants' Motion To Strike Plaintiffs' Statement Of Additional Facts And Exhibits*

Defendants have moved to strike Plaintiffs' exhibits to their statement of additional facts in opposition to summary judgment because: (1) they were not timely served and/or (2) they constitute hearsay, are irrelevant and otherwise inadmissible with respect to Plaintiffs' claims.

*Untimeliness of Plaintiffs' Filing*

In this case, the Court granted Plaintiffs' an extension until May 3, 2013 to file their opposition to Defendants' motion for summary judgment. While Plaintiffs filed their

memorandum in opposition to the motion for summary judgment at 5:54 p.m., they did not timely file their statement of facts and exhibits in support thereof.[2] As noted in another case between these parties, Plaintiffs' counsel has habitually filed materials electronically with the Court after 6:00 p.m. on the day that such submissions were due. *See Carpenter v. Rivera*, *Civ.Act. No. 10-40233-TSH, Mem. Of Dec. And Order on Defts' Mot. For Sum. J.* (Docket No. 67)("*Carpenter Order*").

In the *Carpenter Order,* which was issued on August 29, 2013, the Court stated: "Plaintiff's counsel is on notice that after today's date, if they make an electronic filing after 6:00 p.m. on the date any submission is due, the Court will *seriously* consider striking the submission." *Id.*, at p. 4. Because Plaintiffs' submission in this case, although filed late, was filed before August 29, 2013, the Court will not strike it.

This cannot end the discussion, however. Despite the Court's plain language in the *Carpenter Order*, Plaintiffs' counsel has continued to file materials after 6:00 p.m. on the due date for their submission. The Court reminds Plaintiffs' counsel that any submission filed after the 6:00 p.m., whether the filing be made one second after or more, will presumptively be stricken unless Plaintiffs' counsel can establish good cause for the late filing. That counsel waited until the last minute to file and ran into problems *is not good cause*.

*Plaintiffs' Statement Of Facts/Supporting Exhibits Should Be Stricken As Objectionable*

Defendants seek to have the exhibits which support Plaintiffs' material statement of facts stricken on the grounds that they constitute hearsay, are irrelevant and otherwise

---

[2] At 6:11 p.m.. on May 3, 2013, Plaintiffs filed a motion to impound their statement of facts and supporting exhibits. *See* Docket No. 61. The Plaintiffs served hard copies of the statement of facts/supporting exhibits on Defendants at approximately 4:30 p.m. on May 6, 2013. First, the motion to impound was filed after the 6:00 p.m. deadline and therefore, is deemed filed the next business day, *i.e.,* it was untimely. Second, the motion to impound *should* have been filed in advance of the May 3 deadline to allow it to be ruled on beforehand so that the statement of facts and supporting exhibits could be filed on or before May 3, 2013.

inadmissible as they relate to claims in this case.  More specifically, Defendants move to strike: (1) an expert report which Plaintiffs have attached to their statement of additional facts that was prepared for another case and whose author was not designated as an expert in this case; and (2) exhibits attached to Plaintiffs' statement of additional facts which were produced pursuant to protective orders in other cases involving Plaintiffs' counsel, but not produced in this case, pursuant to a protective order or otherwise.

Plaintiffs have filed a statement setting forth those facts, material and immaterial, which they contend are in dispute. *See Pls' Resp. To Defs' Mot. For Sum Judgment's Statement of Facts* (Docket No. 66), at pp. 116.   Plaintiffs have filed an additional *forty-seven* page statement of 317 additional facts, numbered 49-384.   "Facts" 49-72 are descriptions of exhibits and are not at issue. Facts 73-90 relate to this case and cite to proper authority.   To the extent such facts are undisputed and not duplicative of Defendants' stated facts, I have accepted them.

Plaintiffs' remaining additional facts, *i.e.,* 91-384, include lengthy summaries of other cases which their counsel have brought against the City, Chief Gemme, City Manager O'Brien and/or the WPD—most of which are irrelevant *to this case*.   Furthermore, the statement of additional facts is replete with legal conclusions, which simply do not belong in a statement of *facts*.   Additionally, many of these facts are supported by citations to exhibits which contain references to pending matters or previously litigated matter which were settled.   Such facts should not be considered in support of Plaintiffs' claims under *Monell v. New York City Dep't of Social Services*, 486 U.S. 658, 98 S.Ct. (1978). *See Kinan v. City of Brockton*, 876 F.2d 1029 (1st Cir. 1997)(cases were settled prior to end or trial and thus, decided on basis of negotiations not findings of fact. Considerations leading to settlement are many and varied and may have little to do with basic facts of case-- therefore, such cases cannot be used to prove custom or

practice). Plaintiffs have also cited to an expert report prepared by R. Paul McCauley, Ph.D. for use in another case. Obviously, Plaintiff cannot rely on such expert's opinions *in this case*, without the necessary disclosures required by the Federal Rule of Evidence. Finally, Plaintiffs have asserted facts supported by sealed exhibits and exhibits produced pursuant to protective orders in *Warren v. Rojas*, Civ. Act. No. 09-40127-FDS, *Hayes v. McGee*, Civ.Act. 10-40095-TSH and *Tonelli v. Hurley*, 11-40178-TSH. Such documents should not have been cited unless they have been unsealed and made part of the public record.

Plaintiffs attempts to justify their reliance on the above referenced materials as authority for asserted facts is, at best, disingenuous. Moreover, the Court is not inclined to review Plaintiffs' lengthy statement of additional facts 91-384 to determine which of them may be relevant *to this case* and/or as to which Plaintiffs have cited proper authority. For that reason, Defendants' motion to strike Plaintiffs' statement of additional facts is *allowed* as to Plaintiffs' additional facts 91-384. I will note that given the disposition of this case, the striking of Facts 91-384 is, essentially, a moot point since such facts relate primarily to Plaintiffs' supervisory and *Monell* claims. Nonetheless, it is the Court's expectation that Plaintiffs' counsel will bear these rulings in mind when drafting submissions to be filed in future cases. [3]

---

[3] Plaintiffs' counsel has filed numerous cases in this Court against the City, the WPD, Chief Gemme and now former City Manager O'Brien. In almost every instance, in the Complaint and subsequent filings, counsel cites to and summarizes every other case that they have filed against these defendants and/or other Worcester police officers. It has become increasingly evident that counsel makes no effort to review the facts or circumstances of the cited cases to see if they are relevant to individual or *Monell* claims asserted in the newly filed cases. Consequently, the Court feels the need to remind Plaintiffs' counsel that is they, not that Court, that are charged with identifying relevant facts and legal argument in support of their clients' claims. The Court is simply not going to waste valuable time and resources trying to identify relevant facts and legal argument versus those that are superfluous to the matters at issue. Plaintiffs' counsel's practice before this Court is mainly focused on the prosecution of civil rights and tort claims cases against government entities. These cases provide an important check on federal, state and local police power which this Court appreciates. However, counsel's continuing submission of undisciplined pleadings detracts from the merits of his cases and does a disservice to his clients and the Court.

*Plaintiffs' Motion to Exclude Or Limit Testimony Defendants' Ballistic and Use of Force Experts*

Defendants filed a motion to extend time to respond to this motion, which was opposed by the Plaintiffs.  The Court inadvertently did not rule on the request for an extension and consequently, no opposition was filed.  Having reviewed the Plaintiffs' motion, the Court finds that the motion should be denied.  The arguments as presented by the Plaintiffs in their memorandum are confusing and unfocused and therefore, are not compelling.  In any event, for purposes of the motion for summary judgment, the Court has accepted the facts as asserted by the Plaintiffs and therefore, has not considered the opinions of Lt. Grady and Detective Sullivan.  This ruling is without prejudice to the Plaintiffs filing a *motion in limine* to exclude these witnesses' testimony should this matter go to trial,

**Facts**

On March 24, 2008, Sneade made an emergency call to the Worcester Police Department ("WPD") as the result of an argument between she and her uncle[4], Alfred Sneade ("Alfred") who was intoxicated.  The dispatcher who took the call reported that a woman could be heard screaming in the background and that a subsequent 911 emergency hang up call was received from the residence. Officer Rojas and Officer Andrew Cravedi ("Cravedi") responded to the call.  Shawn Daley ("Daley"), a counselor working with Williamson, Sneade's oldest son, stood outside the home as Officers Rojas and Cravedi approached the front door to the residence.

The residence was a three decker apartment building.  Sneade, Williamson, Russell (Sneade's daughter), Sneade's son Nathan, and Alfred all lived on the first floor. Two adult dogs,

---

[4] It is unclear from the record whether Alfred was Sneade's brother or uncle. For purposes of the pending motions, Alfred's relationship to Sneade is immaterial.

Bruno and Ceece, and their four puppies also lived in the apartment.  Bruno was a four year old Boxer/Chow Chow mix; he weighed approximately eighty-five pounds.

Upon exiting his marked police car, Officer Rojas heard the screaming and shouting of a female voice [5]. Daley identified himself as Williamson's counselor and told the officers that the disturbance was at Sneade's residence. Sneade let Officer Rojas into the house.  Officer Cravedi remained outside as Officer Rojas entered the residence. Sneade continued to yell at someone inside and appeared agitated.

Officer Rojas entered Sneade's apartment through a living room with couches and a TV; to the right was a threshold leading to a dining room; and beyond the dining room, to the right, was a door leading into the kitchen.   As Officer Rojas entered the residence, Russell was seated on one of the sofas in the living room. Williamson and Nathan were in Sneade's bedroom watching television.

Once Officer Rojas entered, Sneade began to walk toward the kitchen to lead Officer Rojas to her intoxicated uncle who was in the kitchen.   As Sneade opened the door to the kitchen, Bruno ran out of the kitchen, stood in the dining room and barked at him.[6]   Bruno came to a stop, sat down and continued to bark at Officer Rojas.   Bruno was 1-2 feet away from Officer Rojas, who was at the threshold to the dining room.   Officer Rojas put on his gloves and fired his gun at Bruno twice; one shot hit Bruno in the shoulder, the other hit him in the head.   The two shots were fired within seconds of each other.   At the time that Officer Rojas fired his gun, neither Sneade nor any of her

---

[5] Plaintiffs contest this facts on the grounds that only "dull sounds" were emanating from the residence. In support, Plaintiffs' cite to *Ex.4,* p. 34 lines 13-16.   However, Plaintiffs have not filed an *Exhibit 4* with their opposition.   To the extent that Plaintiffs are citing to *Exhibit 4* filed by the Defendants (this is the likely case, Defendants filed *Exhibits 1-12* with their motion; Defendants have filed *Exhibits 13-78* with theirs), *Defs' Ex. 4* does not include page 34. *See Docket No. 53.* The fact, which is far from material, is admitted.

[6] The Defendants' facts state that Sneade testified that when she opened the door to the kitchen: "Bruno appeared, ran past her into the dining room and stood barking at Officer Rojas.".   Plaintiffs  assert that this is an inaccurate statement of Sneade's  testimony.   On the contrary, Defendants' statement accurately reflects Sneade's testimony.   Plaintiffs' myriad attempts to split hairs is disingenuous and a waste of this Court's time.

family members were in the dining room; there were no individuals in his line of fire, or in danger of being struck. Russell, who was closest, was sitting behind Officer Rojas on a couch in the living room. Officer Rojas never asked anyone in the residence to get control of Bruno before firing his gun and did not attempt any lesser use of force to control Bruno. The events of the shooting happened quickly and took a matter of seconds.

Williamson came out of the bedroom after hearing the shots and his mother screaming. He found Bruno in a pool of blood; he sat next to the dog and held him. After the shooting, Sneade ordered Officers Rojas and Cravedi out of the residence.

Backup police were called after the shooting. Approximately four additional Worcester police officers arrived at the Sneade residence after the shooting. Plaintiffs rebuffed any further police assistance using expletives and other harsh words to indicate their displeasure towards the police. At Plaintiffs' request, Bruno was transported by a City animal control officer to the Foster Hospital for Small Animals at Tufts University Veterinary Clinic. He had to be euthanized.

The WPD Firearms Policy provides that an officer is authorized to use deadly force to "render harmless an animal which presents a clear and immediate danger of death or serious injury to a human being."

### Discussion

*Whether Officer Rojas Violated Plaintiffs' Constitutional Rights When He Shot Their Dog*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652 (1984). A claim for a Fourth Amendment violation requires allegations of an unreasonable seizure.

Courts have uniformly recognized that pets are "effects" for purposes of the Fourth Amendment. More particularly, the First Circuit has recognized that the killing of a dog may constitute a seizure for Fourth Amendment purposes. *See Maldonado v. Fontanes,* 568 F.3d 263, 270–71 (1st Cir.2009); *see also Viilo v. Eyre,* 547 F.3d 707, 710–11 (7th Cir.2008) ("[U]nnecessarily killing a person's pet offends the Fourth Amendment."); *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose,* 402 F.3d 962, 977–78 (9th Cir.2005); *Altman v. City of High Point, N.C.,* 330 F.3d 194, 201–03 (4th Cir.2003); *Brown v. Muhlenberg Twp.,* 269 F.3d 205, 210–11 (3d Cir.2001); *Lesher v. Reed,* 12 F.3d 148, 150–51 (8th Cir.1994). However, as with other Fourth Amendment interests, such a seizure constitutes a violation only if it is unreasonable. Whether the use of force was reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. 'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.' " *Dziekan v. Gaynor*, 376 F.Supp.2d 267, 271 (D.Conn. 2005)(quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865 (1989)).

"The government retains a strong interest in allowing law enforcement officers to protect themselves and the citizenry from animal attacks. Thus, courts have generally held that no unreasonable seizure may be found where an officer has killed a dog that posed an imminent threat … In contrast, courts have found that the killing of a pet dog by law enforcement officers constituted an unreasonable seizure where the dog posed no imminent danger." *Id.* (internal citations omitted). The ultimate question is whether it was reasonable for Officer Rojas to believe that he was in imminent danger from an eighty-five pound boxer mixed-breed dog that had come running out of the kitchen, stopped within one to two feet of him and continued barking— keeping

in mind that this all happened within a matter of seconds and that Officer Rojas had no information as to whether the dog was a "gentle giant," as posed by the Plaintiffs, or was likely to attack a stranger who had entered the house.[7]  Under the circumstances, the Plaintiffs will be hard pressed to establish that Officer Rojas's actions were unwarranted.  However, given that there is a chance, however slight, that a jury could find that under these circumstances, Officer Rojas's shooting of Bruno was unlawful, I am denying summary judgment with respect to Plaintiffs' Section 1983 claim against him.

While the Section 1983 claim survives, summary judgment shall enter for Officer Rojas on the MCRA claim. A violation of the MCRA requires that a defendant have interfered or violated (or attempted to interfere) with an individual's rights as secured under the United States Constitution and/or the Massachusetts Constitution.  While the MCRA is generally interpreted coterminously with Section 1983, the MCRA has the additional requirement that an individual's constitutional rights be interfered with be by means of "threats, intimidation or coercion."  The underlying event in this case happened in a matter of seconds and Officer Rojas had no meaningful contact with any Plaintiff prior to or contemporaneous with shooting Bruno.  Simply put, Plaintiffs have not pointed to any facts which would support a finding that there rights were interfered with by means of threats, intimidation or coercion.  Therefore, summary judgment shall enter for the Defendants on Plaintiffs' MCRA claims.

---

[7] At the risk of being redundant, it bears repeating that Officer Rojas's actions are evaluated based on what how a reasonable officer would have reacted based on what he knew at the time that the events unfurled, without the benefit of hindsight.  The fact that the testimony may be that Bruno was known to be a gentle dog is largely irrelevant for purposes of this case and probably inadmissible, unless it can be shown that Officer Rojas had prior interactions with Bruno. The Court cannot state it any better than it has been stated by other jurists: "[a]ll dogs ... 'contain a latent threat to human safety ... and can be unpredictable both in their actions and in the signals they send ... '" *Powell v. Johnson*, 855 F. Supp. 2d 871, 875-76 (D.Minn. 2012)(internal citation and citation to quoted case omitted). And while Bruno had come to a stop and seated himself, he continued to bark at Officer Rojas while at close range—had Officer Rojas not acted and Bruno at that point had become aggressive, the risk of serious injury to the officer could have been considerable. *Cf.   Id.*

<u>*Whether Officer Rojas Is Entitled To Qualified Immunity On The Section 1983 Claim*</u>

> 'Qualified immunity is a judge-made doctrine designed to "balance two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably " ' The doctrine thus protects from liability for civil damages all public officials other than those who, 'from an objective standpoint, should have known that their conduct was unlawful.'
>
> The qualified immunity inquiry has two parts. A court must decide whether the plaintiff has made out a violation of a constitutional right and, if so, whether the right was clearly established at the time of the violation. This second part, in turn, has two aspects. The first focuses on the clarity of the law at the time of the violation. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights. The "salient question" is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional.

*Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)(internal citations and citation to quoted case omitted).

In *Maldanodo,* the First Circuit ruled that "the killing of a person's pet dog or cat by the government without the person's consent is … a seizure with the meaning of the Fourth Amendment." *Maldonado,* 568 F.3d at 271. This ruling was issued in June 2009, which was over a year *after* Officer Rojas shot Bruno. However, the fact that the First Circuit had not yet addressed the issue is not dispositive of whether Officer Rojas violated a clearly established right. In *Maldonado*, the First Circuit was analyzing alleged violations which took place in 2007. The First Circuit noted that it was joining three other circuit courts which had previously held that the unlawful killing of a pet is seizure within the Fourth Amendment[8] and that no circuit court had held to the contrary. The First Circuit held that given the consensus of legal authority at the time of the alleged violation, this principle of law was clearly established. *Id.* Accordingly, I find that it was

---

[8] The First Circuit also noted that the Seventh Circuit, in *Villo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008), had taken the same position with respect to the killing of a companion dog after the alleged violations in *Maldonado*. *Maldonado*, 568 F.3d at 271. The *Villo* ruling was issued after the alleged violation in this case.

clearly established at the time that Officer Rojas shot Bruno that the unlawful killing of a pet constituted a violation of the Fourth Amendment.

Whether the second prong of the qualified immunity test is satisfied is a much closer call. Taking the facts in a light most favorable to the Plaintiffs, at this time, I am finding that Officer Rojas is not entitled to qualified immunity. There is a genuine issue of material fact as to the threat which Bruno posed at the time that Officer Rojas shot him, and for that reason, I cannot find, as a matter of law, that a reasonable officer in Officer Rojas's position would have felt that he was in imminent danger and had the right to shoot the dog. The Court will certainly re-visit the issue at the close of Plaintiffs' case when the facts are more fully developed and the Court wil be able to assess the credibility of the witnesses' testimony.

### *Plaintiffs' Claims Against the City, Chief Gemme and City Manager O'Brien*

The Court does not find that on this record, it would be beneficial to undertake an analysis of the supervisory and *Monell* claims against the City, Chief Gemme and City Manager O'Brien. It is the Court's intent to bifurcate the trial. The Section 1983 claim against Officer Rojas will be tried first. If the jury finds that Officer Rojas committed a constitutional violation, the Court will schedule a separate trial on the supervisory and *Monell* claims. Prior to such trial, the Court will likely permit the parties to file dispositive motions on such claim.

### *Plaintiffs' State Law Claims For Assault And Intentional Infliction of Emotional Distress*

Plaintiffs allege that Officer Rojas committed an actionable assault when he fired his weapon in close proximity to them causing them to fear for their safety. Plaintiffs have not asserted any facts which would support an assault claim under Massachusetts common law. Neither Sneade nor Russell, were in the immediate vicinity—Russell, who was the closest, was seated in another room on a couch, a few feet *behind* Rojas (Bruno was in front of Rojas when

Rojas shot him). As to Williamson, who was in his mother's bedroom watching television when Bruno was shot, a claim on his behalf for assault borders on the frivolous. Simply put, there is no evidence to support a finding that Offcier Rojas intended to place any Plaintiff in fear or immenent threat of battery.

As to Plaintiffs' claims for intentional infliction of emotional distress[9], to maintain such a cause of action, each Plaintiff would have to establish that: (1) Officer Rojas intended to inflict emotional distress, or he knew or should have known that emotional distress was the likely result of his conduct; (2) his conduct was extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) his actions were the cause of distress to such Plaintiff; and (4) the emotional distress suffered by such Plaintiff was severe and of such a nature that no reasonable person could be expected to endure it. *Spencer v. Roche*, 755 F. Supp. 2d 250, 268-69 (D. Mass. 2010) *aff'd,* 659 F.3d 142 (1st Cir. 2011)(citing *Agis v. Howard Johnson Co.,* 371 Mass. 140, 144–45, 355 N.E.2d 315 (Mass.1976)). "Recovery has been limited to those plaintiffs who witness the injury or come upon the injured party at the scene of the injury or immediately after the infliction of the injury." *Krasnecky v. Meffen*, 56 Mass. App. Ct. 418, 422, 777 N.E.2d 1286, 1289 (2002)(noting that it is an open issue in Massachusetts whether a party can recover for emotional distress due to death of companion animal).

First, even if a jury were to find that Officer Rojas wrongfully shot Bruno, as a matter of law, his conduct would not rise to the requisite level of outrageousness and atrocity sufficient to permit recovery. Furthermore, the loss of a pet is very traumatic and emotional. But

---

[9] It is not clear that Massachusetts common law would recognize a claim for intentional infliction of emotional distress for the killing of a pet. *See Rule v. Fort Dodge Animal Health, Inc.*, 604 F.Supp. 288, 305 n. 17 (D.Mass. 2009)(citing *Krasnecky*, 56 Mass.App.Ct. at 421-23).

Massachusetts law creates an extremely high hurdle which must be overcome in order to maintain a claim for intentional infliction of emotional distress.  Even assuming that a jury determines that Officer Rojas acted unreasonably in shooting Bruno, there is no evidence in the record to support a finding that any Plaintiff suffered the *severe* emotional distress (such that no reasonble person could be expected to endure it) sufficient to make out a claim.

## Conclusion

It is hereby Ordered that:

1. Defendants' Motion For Summary Judgment (Docket No. 52) is *allowed*, in part, and *denied*, in part;

2. Defendants' Motion To Strike Plaintiffs' Statement Of Additional Facts And Exhibits (Docket No. 68) is *allowed*, in part, and *denied*, in part;

3. Plaintiffs' Motion To Exclude Or Limit Testimony Of Lt. David Grady As A Ballistics Expert And The Testimony Of Detective Daniel Sullivan As A Use Of Force Expert [Fed.R.Evid. 702 and Daubert] (Docket No. 70) is *denied*;

4. Defendants' Motion To Extend Time For Filing Of Opposition To Plaintiffs' Motion In Limine To Exclude Defendants' Experts (Docket No. 74) is Defendants' Motion To Extend Time For Filing Of Opposition To Plaintiffs' Motion In Limine To Exclude Defendants' Experts (Docket No. 74) is *denied*; and

5. Plaintiffs' Assented Motion To Strike Portions Of [75] Plaintiff's Memorandum In Opposition To Motion To Strike (Docket No. 76) is *allowed*.

*/s/ Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**